RANDOLFO MARTY PÉREZ, Plaintiff and Appellee, *v.* TEMÍS-
TOCLES J. RAMÍREZ CUERDA, Defendant and Appellant.

No. 10550. Argued February 1, 1952.—Decided February 26, 1952.

*Martín Avilés Bracero* and *Manuel Janer Mendía* for appellant.
*José Castro Figueroa* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

The only question to be determined in this case is whether or not the lower court acted correctly in decreeing a remedy to secure the effectiveness of the judgment which might be rendered, without security. Let us see: On September 16, 1949, the plaintiff and the defendant signed before a notary public a document which they entitled "Extrajudicial Contract of Ratification of Assignment and Conveyance of Rights in Partnership and Acknowledgment of Debt," and stated therein as follows:

"First: That in October 1947, the parties hereto agreed to constitute a partnership for the establishment and operation of a hospital, and in February 1948, they formally constituted the partnership for the establishment of a hospital and thereby established the hospital known as 'Sagrado Corazón' which has ever since been located and operating at 1408 Ponce de León Avenue, Stop 21, Santurce, Puerto Rico;

"Second: That Temístocles J. Ramírez Cuerda acknowledges in this act and Randolfo Marty Pérez thus sets forth that the latter contributed to said partnership for the establishment and

operation of the 'Hospital Sagrado Corazón' the amount of Ten Thousand Three-Hundred and Forty-two Dollars ($10,342), legal tender of the United States of America;

"Third: That the aforesaid hospital was duly equipped with beds, furniture and other fixtures and effects appurtenant to a hospital of its kind, for which purpose the capital contributed by Dr. Randolfo Marty Pérez as well as that contributed by Dr. T. J. Ramírez Cuerda was used;

"Fourth: That in May 1948, the parties agreed to dissolve said partnership and it was thus dissolved on that same date provided that Dr. Marty Pérez would retain a professional office in the same hospital to take care of his private patients, cost free. It was likewise agreed that any proceeds from the hospitalization of those same patients would be paid to Dr. Marty Pérez as partial payment of his credit amounting to the sum he contributed for the establishment and operation of the Hospital Sagrado Corazón;

"Fifth: The parties finally state that ever since May 1948, when the partnership was dissolved, the agreement between both has been kept in all its parts, Dr. T. J. Ramírez Cuerda appearing ever since as the sole owner of the 'Hospital Sagrado Corazón' and Dr. R. Marty Pérez acknowledging on his part that since that date all his rights and shares were assigned and conveyed in favor of Ramírez Cuerda.

"The executing parties wishing to ratify said dissolution of partnership, to acknowledge and ratify the resulting assignment and conveyance of rights and shares, the formal acknowledgment of the obligation as the same stands today, and the other conditions and stipulations of the contract, do so by means of this document and under the following clauses:

"First: The parties expressly ratify the dissolution of the partnership constituted by them for the establishment, equipment and operation of the 'Hospital Sagrado Corazón' in May 1948, and Dr. Randolfo Marty ratifies the assignment and conveyance of all his rights and shares in the aforesaid hospital in favor of Dr. Temístocles J. Ramírez Cuerda and he furthermore *Assigns and Conveys* hereby any right and share and joint ownership he might have or actually has in the 'Hospital Sagrado Corazón' in favor of Dr. T. J. Ramírez Cuerda.

"Second: The executing parties expressly acknowledge that said assignment and conveyance was made in consideration of

the agreed price of Ten Thousand Three Hundred and Forty-two Dollars ($10,342), legal tender of the United States of America, that is, the amount of Dr. Marty Pérez's contribution for the establishment, equipment and operation of the aforesaid hospital.

"Third: Dr. Randolfo Marty Pérez expressly acknowledges that up to this date and as the proceeds from the hospitalization of his private patients in said hospital he has received the amount of One Thousand and Fifty-one Dollars ($1,051), the obligation thus being reduced to the amount of Nine Thousand Two Hundred and Ninety One Dollars ($9,291) ; and Dr. Ramírez Cuerda expressly acknowledges and confesses that he is owing and owes to Dr. Marty Pérez up to this date and in the above-stated connection, namely, for the selling price of a share in the Hospital Sagrado Corazón, the aforesaid amount of Nine Thousand Two Hundred and Ninety One Dollars ($9,291), legal tender of the United States of America.

"Fourth: As part of the agreement upon the dissolution of the partnership, it is agreed that Dr. Marty Pérez shall be entitled to continue occupying an office in the very premises of said Hospital to take care of his private patients, and on his part Dr. Ramírez Cuerda binds himself to continue paying to Dr. Marty Pérez the entire proceeds from the hospitalization of said private patients of Dr. Marty Pérez in said Hospital Sagrado Corazón;

"Fifth: It is likewise agreed that said obligation of $9,291 shall be settled as agreed to as long as the aforesaid Hospital Sagrado Corazón continues operating, but it is agreed and stipulated that in the event the said Hospital were closed and ceased to operate, the amount of the obligation then outstanding in favor of Dr. Marty Pérez by virtue of this Assignment and Conveyance shall be considered as a preferred credit over any other obligation, and the entire equipment, furniture, beds and accessories thereof shall answer in the first place for the unpaid remainder of the present obligation, that is, of the resulting liquidation after paying all hospitalization proceeds pending liquidation at the date the Hospital is closed or ceases to operate.

"Sixth: While this contract is in force, that is until the obligation is paid in full, Dr. Marty Pérez shall be entitled to use his office in the premises of the hospital without paying

rent or any other consideration, this being one of the principal conditions established upon the dissolution of partnership and assignment and conveyance of share, and this likewise being the reason why Dr. Marty Pérez shall not be entitled to collect interest on the obligation.

"Seventh: If through agreement of the parties Dr. Marty Pérez should move his office from the aforesaid premises, then the obligation shall bear interest from the date said party should fail to receive the benefits thereof as stipulated, and in that event he would not be bound then to hospitalize his private patients in said hospital in which case the manner, terms and conditions for the payment of the balance of the obligation would be fixed in writing, interest at the rate of six per cent (6%) per annum being fixed at this time to be in said case. (*sic.*)

"Eighth: The parties bind themselves to comply strictly with this contract in all its parts and in case of judicial action the losing party shall answer ·for the costs, disbursements and attorney's fees incurred by the other party on his account.

"And in order that this contract shall have full force and validity under the law, pursuant to our wishes, we sign and acknowledge it before a notary, on this date in San Juan, Puerto Rico, September 16, 1949."

Based on that document, on April 4, 1951, the plaintiff filed a complaint in which, after referring to the foregoing ·contract, he alleged that the defendant acknowledged therein ·a debt of money in his favor amounting to $9,291, which ·the defendant would periodically pay to him by permitting ·plaintiff to hospitalize his private patients in the Sagrado ·Corazón Clinic, the cost of said hospitalization being credited ·to the obligation; that "up to this date the defendant has ·paid the plaintiff from hospitalizations the amount of $4,199 and still owes him the sum of $5,092; that the defendant withdrew from the Hospital Sagrado Corazón, closed said hospital and told plaintiff that he could not continue paying ·any amount or installment whatsoever in connection with the ·obligation contracted, for he had closed the Hospital Sagrado ·Corazón since March 31, 1951"; that the defendant owes

him the aforesaid sum of $5,092, payment of which plaintiff has unsuccessfully requested from him on different occasions. He prays for judgment in the above-mentioned amount, with costs, interest and attorney's fees.

An order of attachment without bond was decreed at plaintiff's request and the defendant, after denying the essential facts of the complaint, moved the court *a quo* to dissolve the attachment levied. The court refused, citing *Avalo* v. *Porrata et al.*, 19 P.R.R. 19 and *Fabelo* v. *Quintana Reyes*, 47 P.R.R. 67. Reconsideration was sought and denied.

 The defendant alleges now that the lower court erred in decreeing the remedy without bond. Although pursuant to § 4 of the Act to Secure the Effectiveness of Judgments (Revised Statutes, 1911, p. 850, § 5236) "If it be clearly shown by means of any authentic document that the fulfillment of the obligation may be legally enforced, the court shall decree the remedy without bond," [1] we have repeatedly held that notwithstanding the provisions of said Act "in order that an attachment to secure the effectiveness of a judgment may be decreed without bond, *it is necessary that it clearly appear from an authentic document that the obligation may be legally enforced, which means that not only must the document on which the petition is based be authentic, but that the judge may determine easily whether the obligation exists and is enforceable.*" (Italics ours.) *Avalo* v. *Porrata et al.*, *supra*; *Polanco* v. *Goffinet et al.*, 26 P.R.R. 286; *Roig* v. *Landráu*, 29 P.R.R. 294; *Pérez* v. *The National Surety Co.*, 53 P.R.R. 501.

It can not be gainsaid that in the case at bar the document on which the complaint was based was authentic. However, that is not enough. Although from the face of the complaint it appears that the defendant acknowledged in an

---

[1] After the quoted words above copied, § 4 of the Act recites: "In any other case, it shall be required that a bond be furnished."

authentic document an obligation amounting to $9,291 in plaintiff's favor, nevertheless, it likewise appears therefrom that said obligation would be periodically paid by plaintiff's hospitalizing his patients in the Sagrado Corazón Clinic. Hence, evidence to fix the exact amount of the obligation, if it really existed, was necessary. Consequently, this is a case in which the trier could not easily determine whether the obligation really existed and was enforceable. Therefore, the remedy should not have been decreed relieving plaintiff from furnishing the bond required by § 4 itself of the aforesaid Act.

·Avalo v. Porrata, supra, as we have seen, is adverse to the conclusion reached by the lower court, and Fabelo v. Quintana, supra, is clearly distinguishable, inasmuch as the complaint filed therein was based on a prior judgment in plaintiff's favor, and by express provision of § 3 of the aforesaid Act, as amended by Act No. 27 of April 13, 1916 (Sess. Laws, p. 77) "If security of judgment is prayed after the same has been rendered no bond shall be required." [2]

The order appealed from will be reversed and the case remanded to the lower court for further proceedings.

---

[2] See the discussion of Fabelo v. Quintana, supra, in Pérez v. The National Surety Co., at page 480 of volume 53 of the Reports of this Court, as well as Boyrié v. Mariño, 58 P.R.R. 286.